Parker, J.
The case of the state of Ohio on relation of Thomas H. Walbridge against Samuel M. Jones, mayor of the city of Toledo, is a proceeding in mandamus. The 'case of Harvey P, Platt against John Craig and others is a suit for an injunction. *685 Both are with respect to the same subject matter and involve proceedings under an act entitled “An act to supplement section 2835 of the Revised Statutes of Ohio,” which purports to -have been passed and to have taken effect on April 14, 1900. The act is found in 94 O. L. 175.
Speaking in general terms, the act provides for certain proceedings to be had in cities of the third grade of the first class to accomplish the location and construction of a bridge across a. navigable river. It provides for the appointment of a commission who shall prepare general plans and specifications for .such a bridge, upon a certain petition being filed, and it provides that after certain proceedings — 'the filing of petitions •and the report of the bridge commission — the mayor of the city shall issue a proclamation for an election to be held under the act, in order that it may be determined whether or not any bridge shall be built, and if so, at what location; the act also ■providing for the building of the bridge alt the location thus ■selected.
Now the oetition in the mandamus case sets forth that all the -steeps have been taken, in accordance with the statute, which require of the mayor the performance of his duty, to-wit, the issuing of a proclamation for an election. And it sets forth ■fhalt the mayor has, for various reasons, declared that he will mot perform this duty. The answer in that case on behalf of the mayor, sets, forth several objections to the- staltute and to 'the steps taken under the Statute, amounting, as it is claimed, to invalidity in the statute and such irregularities in the steps taken under the statute as that the mayor is not called upon ‘to issue the proclamation.
The petition in the injunction case, which is brought against certain of the bridge commission and the mayor, to restrain •them from proceeding further under the act, sets forth substantially the same objedtions to the law and the proceedings under the law as are set forth in the answer in the mandamus case; and the answer in the injunction case sets forth sub■sltiantially the same objection to the act, and the action taken tinder the act, as are set forth in the petition in the mandamus <case.
*686 So the cases have been heard and considered together, and will be decided at the same Itime. In deciding them we will take up the points of objection to the law, and to the steps taken under the law, in .substantially the order in which they are set ouit in the pleadings- on behalf of those who assert these-objections, and in the order in which they have been presented in argument.
The first objection urged to the law is, that it was not regularly passed. It is said that the bill which was introduced in: the house, and designated as “House Bill No. 749,” and which was passed and messaged over to the senate, was substantially different from the bill as passed by the senate, and, therefore, it not being the identical bill passed by the house, it has not received in both houses the vote required by the constitution: in order to -effect its adoption.
Section 17, art. 2, of the constitution provides- as follows v
“The presiding officer of each house shall sign, publicly in the presence of the hous® over which he presides, while the same is in session, and capable of transacting business, all bills and joint resolutions passed by the general assembly.”
This act, -according to the -certificate attached to the ses-sionlaws, and according to the engrossed copy with which we are-furnished, appears to be properly authenticated in accordance with these provisions of the constitution.
Another provision of the constitution that we will have occasion to refer to is section 9, Article 2, which reads as-follows:
“Bach house shall keep a correct journal of its proceedings,, which shall be published. At the desire of any two members,' the yeas and nays shall be entered upon the journal; and, on the passage of every bill, in either house, the vote shall be taken by yeas and nays, and entered upon the journal; and no law shall be passed in ¡either house, without the concurrence of a majority of all the members elected thereto.”
It is said that this bridge law did not receive that vote, i. e.. “the concurence of a majority of all the members elected thereto,” in both houses; that one bill, was voted upon in the lower house and another bill was voted upon in the senate.
*687 The evidence upon this subject, which we are asked to consider, consists of what purports to be a copy of “House Bill No. 749,” as it was introduced into the.lower house, and a transcript from the journal of the house, which purports to set forth all the action taken upon this bill in the house, and a certificate thereto of the acting assistant clerk of the house; also the bill as engrossed and sent over tc me senaite, together with a transcripto from the journal of the senate setting forth all the action taken in the senate upon this bill, and attached to this is a certificate of 'the assistant clerk of the senate stating that the transcript and ¡this copy of the bill are correct.
This evidence was received under objection to its competency. It is said that the clerks of either house may certify, to the proceedings of the house wherein they serve respectively, to the facts appearing upon the journal, in other words, they may certify to transcripts from the journal, and that this will be evidence in so far as the matter therein appearing is properly upon the journal; but beyond that, fthe certificate is of no effect and cannotbegiven consideration. lit- is also contended that there is no provision of law for the deposit with, or keeping by, the clerk of the house, where it was introduced, of the original bill, and that therefore the certificate as to that being a copy of the original bill must be disregarded.
It is agreed that these certificates, in so far aJs they state that the contents of the papers attached to them are transcripts of the proceedings of the respective houses, may be considered as the testimony of the persons who signed the certificates, subject, however, to the same objections to their competency that might be interposed if they were here testifying.
The difference between the bill as it passed the house and the bill as it passed the senate is said to consist in the omission from the latter of the word “hundred” in the third line of the law as printed upon page 177 of volume 94 of the session laws.
The law provides that before any proceedings are had under the act, or before any work is done, or before any contract-shall be let for the construction, reconstruction, enlargement or repair of any such bridge, there shall be filed in the office of the city clerk of such city, petitions signed by not less than twenty-five per cent, of the duly qualified electors of such city, *688 •and that immediately upon the filing of such petition or petitions, containing not less than twenty-five hundred signatures as therein required, the city clerk shall publish for five 'consecutive days in not les's than three (if so many there are) newspapers published and in general circulation in such municipality, a notice isetting forth the filing of said petitions, and the location of the bridge that is petitioned to be constructed, reconstructed, enlarged, etc.
The provision from which the word “hundred” is omitted is to the effect that those desiring a bridge at any other location may also file their petition, and that their petition shall be considered and the location voted upon, if they file a petition signed by not less than “twenty-five hundred” qualified petitioners, (as it is said the law provided for as introduced m the house), or by not less ithan “twenty-five” qualified petitioners, as it appears upon the statute books. It is contended and we are of the opinion that the difference in the bill as introduced in the house and as we find it upon the .statute books is a material difference.
As to whether this evidence is competent, when introduced for the purpose of impeaching the law, we have no direct decisions by the Supreme Court of. the state. We have, however, the case of the State v. Kiesewetter, 45 Ohio St., 254, in which it was attempted to establish a law which had not been signed by the speakers of the respective houses, and which had not been authenticated as required by the constitution. It was there held that parol evidence was inadmissible to show that a certain law had been passed. In that connection it was undertaken to introduce in evidence a like copy of the original bill, which it appears had been deposited in pursuance of law with the librarian of the state. The Supreme Court held that such evidence, in such a case, was not competent; and the discussion we think is pertinent to the question we have under consideration here, although the case is not precisely the same. There is much of it and I shall not take time to read it. It is of such character that its full force and effect cannot be gathered without considerable attention being given it, and therefore I shall not enter upon its discussion.
We have also State ex rel. Herron v. Smith, 44 Ohio St., 348, in which if was undertaken to defeat a law upon the *689 ground that it had not received a constitutional majority, 'it being averred that one of the members was not duly elected to the house, and that there was a conspiracy between the officers of the house and the senate, to foist upon the people as a law a bill that had not been regularly and constitutionally •passed. The question of evidence of this character was there ■considered, and it was held to be inadmissible. There is some •discussion also of the effect of introducing a certified transcript of the journal in that case to which I shall make further •reference.
On the authority of these cases we hold that these certificates, in so far as they go beyond certifying to the contents •of the journal, will be ruled out.
If, however, we were to consider this, and not rule it out, I desire to call attention to the effect that we should fe'el ■obliged to give to it. If received and considered the record affords no more than negative evidence that the bill was not •amended in the house by the striking out of the word “hundred.” It is doubtful if it goes that far, as it appears to us from the transcript of the journal of the house' that it was engrossed in its. present form, according to the evidence submitted, and read the third time and put upon its passage in its present form.
The transcript from the journal of the house, after setting forth the introduction of house bill No. 749, and after stating that it was referred to a certain committee consisting of Mr Griffin and Mr. Demuth, says that the committee reported it 'back with certain proposed, amendments, that those amendments were agreed to, and then it proceeds as follows:
“The bill was ordered to be 'engrossed at the clerk’s, desk, and read the third time now. The bill was then read the third time.”
And according to the journal, if the clerk performed the •duty imposed upon him by the order of the house, which he is presumed to have done, the bill was read the third time after it had been engrossed at the clerk’s desk. The engrossed •copy with which we are furnished omits the word “hundred.”
Then follows this upon the house journal:
“The question being ‘Shall the billpass?’ the yeas and nays were taken, and resulted — Yeas, 76; nays, o.”
*690 This is followed by the record of the votes of the members. And that is the only action taken in the house on the bill. So that while it does not appear in affirmative form that any amendment was proposed, striking out the word “hundred,” it does appear that after the bill was engrossed and submitted to the house upon the third reading, and when it was voted upon and passed, the word “hundred” was no longer in it. The house listened to the reading of the bill with the word “hundred” omitted, made no objection to any change or amendment, and by unanimous consent of the body it was carried, and the bill was adopted by the house in that form. It is conceded that in the same, i. e., its present form, it was duljc passed by the senate.
In Miller v. State, 3 Ohio St., 475, one of the questions was whether the bill had been read on three different days in each house, as required by section 16, article 2, of the constitution. The court, Thurman, J., delivering the opinion, was inclined to treat the provision as directory, but said:
“Whether the constitution, in the particular under consideration, is merely directory or not, it can not be gainsaid, it seems to us, that where the journals show that the bill was-passed, and there is nothing in them to show that it was not read as the constitution requires., the presumption is that it was so read, and this presumption is not liable to be rebutted by proof.”
There is much more to the same effect in decisions cited and commented upon in State ex rel. v. Smith, supra.
Our attention has been called to a decision of the circuit court in State ex rel. v. Price, 8 C. C., 25, which, it is contended by counsel for the objectors (as I may call them for short), is not in harmony with the views we are here expressing. That case was peculiar in its facts. It is there, held, as stated in the syllabus, as follows:
“In determining the existence of a statute, the house and senate journals may be examined notwithstanding the act appears in the annual laws with the required certificate of the speakers of each ‘house, and the usual certificate of the secretary of state appended to. the volume.”
*691 But, as I say, they had under consideration a very peculiar state of facts, and the question which seemed to be under consideration was as to the identity of.the bill. Here there is no question raised as to the identity of house bill No. 749. That is to say, while it is contended here that the contents of the bill as it passed the senate, are not exactly identical with the contents of the bill as it passed the house, yet that they are substantially identical, and that it is house bill No. 749 is unquestioned. As to the identity of the bill or ¡the identity of the document here, there is no dispute, but there does seem to have been such a dispute or such a question in the case decided by the circuit court in the eighth circuit.
In looking at the session laws we find that they had to meet this state of facts: In volume 88 of the session laws, at page 256, appears an act “to abolish the office of street commissioner in certain cities of the third and fourth grade, second class, and to create the office of street superintendent,” passed March 31, 1891, apparently duly certified, and designated house bill No. 1460.
On page 279, same volume, we have an act with precisely the same title, and also designated house bill No. 1460, and yet the bills are materially different. Upon the question being made as to the passage of this bill the court looked at the journal and came to the conclusion that neither one nor the other was the identical bill, that they were both wrong, and that there was no law in force upon the subject. We so understand this decision, and we are not prepared to say that we should not have pursued the same course and arrived at the same conclusion in a case like it upon the facts.
The second serious objection raised is as to the constitutionality of this act. It is urged that it is obnoxious to the provisions of section 22, article 2, requiring that all laws of a general nature shall have a uniform operation throughout the state; also to the provisions of section 1, article 13, prohibiting the general assembly from passing any special act conferring corporate power; and also to section 6, article 13, requiring that certain legislation affecting municipalities shall be of general form and effect.
The argument, however, has been addressed chiefly to the proposition that the law is one of a general nature and that it *692 does not have a uniform operation through the state, because it is confined or restricted by its terms to cities of the. third .grade of the first class. That, if is said, is sufficient to render it invalid. It is further urged that it is restricted not only •±o cities of the third grade of the first class, but to such cities ■of that grade and class as may have navigable streams in or passing through them, and therefore it establishes, for the purposes of this law, another classification of municipalities.
This has been argued with great earnestness, and since the ■oral arguments the court has been bombarded with briefs, counter-briefs, i/ebutt'ers, sur-rebutters, «.etc., and we have given the question- the careful examination which its importance seem to require and which the earnestness of counsel seem to make it proper for us to give to it.
To the objection that the law is of so general a nature that it must have a uniform operation throughout the state, the answer is, that if it is made to apply to all cities of a recognized and approved class it has a uniform operation through the sítate. That it is a law of a general nature we are disposed to grant. The nature of the law is to be determined, as we understand, by the character of the subject-matter and not by the form of the law. If it is a subject-matter of a general nature, notwithstanding the form of the law may be local or special, .within 'the meaning of this provision of the constitution it is an act of a general nature, which must, in order to its validity, have a uniform operation throughout the state.
.It has been held distinctly in State ex rel. v. Davis, 55 Ohio St., 15, it'hat the subject-matter of bridges over streams is a subject-matter of a general nature requiring general legislation under the constitution. But, as I have indicated, .it does not follow that because the subject-matter is of a general nature and therefore required to be embodied in a law of a general form that shall have a uniform operation throughout the state, it is obnoxious to ¡this provision of the constitution merely because it is limited to certain municipalities of the state.
The queslt-ion remains whether the subject-matter is appropriate to municipal control, and therefore proper to be brought *693 under such classification of municipalities as has been approved by our Supreme Court.
It has been suggested in argument that the Supreme Court has intimated a disposition, and perhaps a purpose to disapprove of its earlier decisions sustaining the classification of municipalities established by laws which have stood upon the-statute books for .many years; that it has shown lately a disposition to overrule those decisions and hold such classification to be invalid. We have examined this question with some-care, and we cannot agree with counsel that such action at the hands of our Supreme Court is imminent.
I will call attention to a few of the decisions throwing light upon this question, and also upon the question of what are-laws of a general nature, and what is meant by the phrase, “uniform operation through the state.”
In State v. Brewster, 39 Ohio St., 653, it is said in the syllabus :
“The classification of municipal corporations provided for in the Revised Statutes, sections 1546-1550 referred to in-the act of 1883 (80 O. R, 124), is authorized by the constitution, and is not in conflict with article 2, section 26, nor article 13, section 6; and the fact that territory is attached to-any such corporation for school purposes does not affect the validity of such classification.
And reading from page 658:
“When the bill providing for the classification referred to in-the clause quoted from the act of April 16, 1883 (2690a), was reported to the general assembly, the reasons in support of such classification were stated by the codifying commissioners-at length. Revised Statutes, Preface VIII-X. The objection that the classification was illusory was conceded to be forcible, but it did not prevail. On- the contrary, the reasons given by the commissioners in support of such classification were-thought to be sufficient, and hence the classification was adopted. Revised Statutes, sections 1546-1550. The validity of that classification has been repeatedly recognized in this court, and the reason for adhering to that construction of the-constitution are cogent and satisfactory. Hence, we hold thalt statutory provisions with respect to any suc'h class are for *694 governmental purposes, general legislation, and not in conflict with article 2, section 26, nor article 13, section 6 of the constitution.”
In State v. Hawkins, 44 Ohio St., 98, it is held that:
“The act of the general assembly passed April 3, 1884, (82 O. T., ioi-iii), conferring certain corporate powers on cities of the first grade of the first class, is one of a general, and not of a special nature; and, (therefore, not in conflict with article 13, section x, of the constitution, prohibiting the passage of special acts conferring such powers.”
The court in this case reviews certain of the decisions Ithat have gone before, and speaking of this subject of classification, uses this language, page 108:
“The act under consideration in that case,” (the Pugh case), was held invalid, because it- was not merely made applicable to the grade and class to which Columbus then belonged, but because it was the only city in the grade and class to which it then belonged, or could belong in the next five days from the passage of the act, the time in which the 'powers conferred were required to be exercised; after the lapse of thalt time neither Columbus, nor any other city of its grade, could have exercised the powers conferred by the act.
“To hold this statute invalid, for the reason stated, would be to deprive not only Cincinnati, but every city of the state of any system of municipal government whatever; as all statutes conferring -corporate power upon the municipalities of the state apply, in terms, to cities of certain* grades and classes. There should be something more (than a mere question as to the validity of a statute, to warrant a court in a holding that must lead to such serious consequences.”
In State v. Hudson, 44 Ohio St. 137, it is held that:
“The act of April 3, 1885, (82 O. L., 101), providing for a police force in ‘cities'of the first'grade of the first class,’ applies to all cities of that grade and class in the state, and is a law of a general naiiure, having a uniform operation throughout the state, and is constitutional.”
That is quite pertinent to this case and the argument advanced here. Although the law applied to but one city, yet it applied to a city classified as a city of..the first grade of’the *695 first class. Notwithstanding the subject-matter was of a general nature, and therefore one that must be operated upon by a law of a general nalture having a uniform operation throughout the state, the law was sustained upon the ground'that it had uniform operation through the state, although at the time it applied to but the one city of Cincinnati. In discussing the matter Judge Folletlt says, on page 139:
“This question vitally affects Cincinnati, as well as Cleveland, Toledo, Columbus and Dayton; for, at present under our system of classification of cities, there is bult one of these cities in a general class.” “This act (section 1870) applies to ‘cities of the first grade of the first class’ — to all such cities in Ohio— though Cincinnati is now the only city in that class. Each city just named is. now similarly situated. Each of the large cities seems to need peculiar legislation, which can be provided only by such general classification. The peace and prosperity of these cities, and the best interests of the state, require that this system of classification be regarded as stare decisis and settled. See Rev. Stat., sec. 1546. Under the- power to organize cities and villages, (Const., art. 13, sec. 6), the general .assembly is authorized to classify municipal corporations, and an act relating to any such class may be one of a general nature.”
While I have referred to several and shall refer to other decisions, letting the Supreme Court speak for itself on this subject, I shall not exhaust the list by any means.
In Marmet v. State, 45 Ohio St., 63, it is held 'that:
“The provisions of secs. 1, 2, 22, 26 and 35 of the' act of April 16, 1883 (80 O. L., 129), and sec. 29 as amended March 25, 1884 (81 O. U., 78), which require that in cities of the first grade of the first class each proprietor or lessee of a theater, etc., and all keepers or owners of livery, sale or. boarding stables, every dealer in second-hand articles and keepers of junk shops, and the owners of all vehicles used upon the streets of the city, shall pay license as therein provided; that no person shall engage in any such business until a license therefor shall have been obtained, and thalt any person who shall violate any of the-provisions 'of the act shall be punished by fine, are not in conflict with the constitution.”
*696 Respecting ¡that law it is said by Judge Spear, on page 66;
“The law is not a special act. It is local and special as to the ends to be accomplished, but general in its terms and operation, applying to all cities of the first grade of ¡the class. It is not limited to such city as may have been in that class and' grade at the date of its enactment. At that time Cincinnati was the only city in the state answering to the description; but there is a possibility, not to say certainty, that- other cities-in the state will increase in population, so that they will pass into this grade, and when that happens ¡they will come within the provisions of this law.”
Another case in point is that of the State v. Wall, 47 Ohio St. 499. I refer to the last paragraph on page 500, and refer to this -clause because it is the utterance of .the whole court — a per curiams
“Grave doubts may well be entertained as to the constitutionality of this method of classifying cities for the purpose of general legislation. But it has received the sanction of this court in repeated decisions heretofore made; and in view of this fact, and the rule that forbids a court to declare a law enacted by the legislature as unconstitutional, unless clearly convinced that it is Iso, we do not feel warranted in doing so ia this instance.”
Recent doubts upon this question seem to have arisen chiefly from the dicta of one of the judges of ¡the Supreme Court in the course of his opinion in Hixson v. Burson, 54 Ohio St. 470, 483, to the effect that the doctrine of classification of municipalities has been applied and upheld only where the laws in question related to the organization of such municipalities,, and that it cannot be upheld when applied to a subject, in such municipalities, of a general nature, requiring laws of uniform operation throughout the state.
The act providing for the Toledo gas plant, upheld in State v. Toledo, 48 Ohio St. 112, confers corporate power. This is a case in which something else than -organization simply is provided for. Indeed, no organization is provided for, except the organization of a board to take care of that particular enterprise.
The case of Seifert v. Weidner, 12 C. C., 1, sustains- a law by which the power to build a crematory was conferred *697 upon the city of Dayton, that city standing, with respect to ithe constitution, precisely as does Toledo, being but one of a class. That law also conferred corporate power, and did not relate to municipal organization.
The law authorizing Cincinnati to pave streets and issue bonds to the amount of $2,000,000, (80 O. D., 156), was held to be constitutional by the Cincinnati superior court; Sheer v. Cincinnati, 14 Am. L. R. 111; and this was affirmed by the Supreme Court without report January 19, 1886. This law conferred corporate power, and did not relate to municipal organization.
Another law to which we call attention is that authorizing Cincinnati to build waterworks and issue bonds to the extent of $6,500,000 (93 O. L,., 606) passed upon and sustained in Ampt v. Cincinnati, 12 C. C. 119; affirmed 56 Ohio St., 47. That law confers corporate power, and is of a general nature.
Of a like character is the law considered in State v. Brewster, 39 Ohio St., 653.
In State v. Nelson, 52 Ohio St., 88, in an opinion by the same judge, who uttered the dicta in Hixson v. Burson, supra, this occurs:
“This section of the constitution requires (that laws of a general nature shall have not only an operation, but a uniform operation throughout the-state, that is the whole-state, and not' only- in one or more counties. The operation must be uniform upon the subject-matter of the statute. It cannot operate, upon the named .subject-matter in one part of the state differently from what it operates upon it in other parts of the state. That is, the law must operarte uniformly on the named subject-matter in every part of the state, and when it does that it complies with this section of the constitution. That’this is the scope and purpose of this .section appears from its language, the debates of the constitutional convention, and the uniform construction placed thereon by this court in the cases above cited, and others hereinafter referred to.
As the statutes affecting different cities and villages of *698 different classes practically do not operate in every part of the state, but only where a city or village of the particular-class is found, it might seem that such laws do not operaiteuniformly throughout the state. A moment’s reflection will show that this is not so. If a new city or village of a particular class should be built in the wildest spot in the state, the statutes applicable to such class of city or villages would, be found to be in force there, and in that sense all statutes applicable to different classes of cities and villages, are in uniform operation in every pant of the state. The classification, of cities and villages is in its nature territorial, and this-court has uniformly -held that such classification must be reasonable and not arbitrary.”
In State ex rel. v. Baker, 55 Ohio St., 1, at page 10, JudgeMinshall, speaking for a majority of the judges, in the course-of a very vigorous opinion in support of the doctrine of classification of cities and villager, with respect to this utterance of Judge Burket in Hixson v. Burson, supra, uses this-language: •
“What was said on the subject of the classification of cities-in Hixson v. Burson, 54 Ohio St., 470, was not germain..to the case considered. It was- not concurred in by all the judges y and, by a rule of this court, adopted in 1857 (6 O. S., note), the concurrence of the judges in an opinion is limited to the-part necessary to the decision, and expressed in the syllabus.” This case is one of the latest and strongest in support of' the classification of municipalities — holding that the adoctrinéis to be regarded as stare decids. -
Counsel cite Ampt v. Cincinnati, 12 C. C. 119, a case decided’ by the circuit court in the first circuit and affirmed by the-Supreme Court. 56 Ohio St., 47. Ejspecial attention, has been called to certain language used by Judge Swing, who-announced the opinion of -the court. His language appears to be relied upon by counsel on both sides, of this controversy as sustaining their respective positions; and it is said' it should be regarded as in effect the language of the Supreme-Court because in affirming the decision the Supreme Court say it is affirmed for the reasons) stated by the judge of the-circuit court in passing upon the case. The law there under *699 consideration was one providing for the construction of waterworks in the city of Cincinnati. It was held that the law was constitutional, and this is said in the syllabus:
“Wherever a law relates to the government of cities, and to the doing of corporate acts by said cities, and only indirectly affects the citizens, it is not a general law within the meaning ‘of section 26, article 2, of the sítate constitution, although the subject-matter, if applied to any portion of the state other than classified cities and incorporated villages, would be a law of a general nature.”
Judge Swing says that he deduces this rule from the decisions of the Supreme Court, on the subject, and he uses this language:
“It seems to me'that ¡there is a rule deducible from these decisions, and that is, thát whenever any law, directly operates upon and affects the rights, privileges and interests of the citizen, and there is no reason why it should not operate on all the citizens of the state alike, it is a law of a general nature within the meaning of this section of the constitution, and it should have a uniform operation throughout the state. But wherever a law relates to the government of cities and to the doing of corporate acts by said cities, and only indirectly affects the citizen, it is noit a general law within the meaning of this section, although the subject-matter, if applied to any portion of the state other than classified cities and incorporated villages, would be a law of a general nature.”
If I were to venture to amend this I would say, that while such law would be a law of a general nature, according to several of the decisions of the Supreme Count from which I have read, it would not be such general law as is prohibited by the constitution, because it is given uniform 'operation throughout the state.
I think the point that Judge Swing undertook to state, and has stated with more or less clearness, is, that there are certain subjects of a general nature, which, if legislated upon in a form affecting citizens directly, must have a general and uniform operation'throughout the state. Por instance, if the legislature were to enact a. law making it unlawful for the citizensi of cities-of the ¡third grade of the first class to do certain *700 thinlgs in such cities, lawful elsewhere, such a law affecting and operating upon the citizens and the rights of the citizens immediately, must apply to and reach the whole state and the whole population of the state. And yet, the legislature might properly pass a law authorizing cities of that class to pass ordinances with respect to the same subject-matter, making it unlawful to do that very thing; and such a law, having uniform operation upon the cities of the specified class, might be, under the decisions, a law of uniform operation throughout the state, and valid.
This point is indicated more clearly by Judge Summers in Seifert v. Weidner, 12 C. C., 1, affirmed in 55 Ohio St., 646. It was the application of this principle, as I understand it, which resulted in the law in question being held unconstitutional in the case of Cincinnati v. Steinkamp, 54 Ohio St., 284; it being a law providing for fire escapes on buildings of a certain height in cities of the first grade of the first class. It did not provide that a city of the first grade of the first class might' pass an ordinance to regulate the subject, but it provided directly that the citizens residing within the territorial limits of such a city should do certain things, and it was therefore held to be unconstitutional. In the one case the citizen is the unit operated upon by the law, and in the other case the municipality is the unit operated upon.
In speaking of the Steinkamp case Judge Summers, in Seifert v. Weidner, supra, says:
“We think that case is distinguishable from this. It will be observed that the act under consideration in that case did not confer power upon cities of the first grade of the first class to regulate the construction of buildings within their limits, but provided for the appointment, by the mayor of such cities, of inspectors, and prescribed their duties and the regulations to be observed, and provided that any person violating any provision of the act should be guilty of a misdemeanor and -subject to finé and imprisonment. If the act had conferred the power upon cities of the first grade of the first class, any such city could, by ordinance, have prescribed /the same regulations and enforced them by fine and imprisonment, and the act would not have been in conflict with' section 26 of article 2.”
*701 What was said by the court in Cincinnati v. Steinkamp, supra, is in line, we ¡think, with the suggestion's of Judges Swing and Summers. I read a portion of a paragraph on page 295:
“And it would seem to follow from this that the constitutional requirement of uniform operation throughout the state is not answered by showing that the law is of uniform operation within one city of the state only, however populous, and even though described a's a city of the first grade of the first class, if it appears that the act does not confer power, corporate or administrative, and that the conditions undertaken to be legislated upon are common to other sections of the state generally.”
In other words, if it appears that the legislature is operating directly upon the citizen, and not indirectly by conferring corporate power upon the municipality, then the law will not be valid unless it operates upon the whole population of the state.
A further illustration of what is meant by the phrase “having a uniform operation throughout the state” will be found in Gordon v. State, 46 Ohio St., 607, wherein the township local option law was. held to be constitutional. I shall not stop to read it. !
So we hold that, the fact that there is but one city of the class to which the law may apply is not a valid objection to the law; and we also hold, that the fact that the law might have been so framed as to be equally suitable for and applicable to certain .other cities of certain other grades and classes is not a valid objection to the law; and the fact (if a fact) that all municipalities of or that may come into the class may not be in a similar natural situation, so as to make use of the law— that is, may not have navigable streams to bridge, and therefore are not in situations to avail themselves of the law — is not a valid objection to the law.
To hold otherwise would be to ignore-many decisions of the Supreme Court, overturn classifications heretofore approved, and invalidate many laws applicable to certain classes that may be found by the courts to be suitable to other classes, or not available to certain municipalities of a class because of the *702 natural situation giving rise to no need of the siame. See State ex rel. v. Toledo, 48 Ohio St. 112.
We think the matter of building bridges within municipal borders, to be paid for by such municipalities, is a proper subject of municipal control, and may be provided for by a law applicable to a class, and that such a law will be one of a general nature having a uniform operation throughout the state, if the classification is legitimate within the rules laid down by the Supreme Court.
I call attention to the fact that sec. 1692, Rev. Stat., conferring powers generally upon municipalities, provides that the council shall legislate upon and provide for bridges, viaducts, wharves, and a variety of things of that character, as well as for the care and improvement of streets and alleys; so that though the building of bridges is a subject-matter of a general nature, it is also a subject-matter appropriate to municipal control under certain circumstances, and therefore subject to proper laws of classification of municipalities.
But it is contended that this law defines a new class, i. e., “cities of the third grade of the first class having a navigable river passing into or through the same;” and that this classification and. limitation is fanciful and illusory, and in effect limits the act to Toledo. As Toledo is the only city of the third grade of the first class in -the state it is apparent that if this is a new classification it does ncit affect existing conditions.
A's to the future, we can not say judicially that other cities of the third grade of the first class, hereafter coming into existence, may not have navigable streams. Indeed we cannot say that they may not all have navigable rivers. And among the growing and prosperous cities of the state that may come into this class we take notice of Fremont, Portsmouth, Marietta, Zanesville, A'shtabula, Conneaut, and others, all upon navigable rivers.
But we do not regard this as classification. We regard it as simply a provision for a condition that may or may not exist in such cities.
In Cincinnati v. Steinkamp, 54 Ohio St. 284, 295, in speaking of the phrase “existin/g in every county throughout the state” the court say:
*703 “This means, we suppose, only in every county where the, ■conditions of the statute exist, for in order to be general and uniform in operation it is not necessary that the law should operate upon every person in the state, nor in every locality; it is sufficient, the authorities coincide in holding, if it operates upon every person brought within the relation and circumstances provided for, and in every locality where the conditions ■exist.”
To hold that this is classification that renders the law invalid, would be to adopt a rule that, carried to its logical result would require us to hold such legislation invalid even if it were made applicable to all municipalities in the state, from •cities of the first class down to hamlets. The 'same objection could be brought forward with equal force if a law were made applicable ,to counties instead of municipalities; for instance, it might be said that the ditch laws undertake to classify or actually effect the classification of counties, because some counties have no use for such great drainage canals as we have been obliged to build in Wood county, and other counties of Northwestern Ohio, and that the ditch laws classify counties by putting in one class those that may avail themselves of the law, and in the other class those that cannot make use of the law.
The same objection might be raised to laws providing for various objects recognized as being within the legitimate scope ■of municipal government; that is, laws applying to wharves, viaducts, canals, hospitals, parks, ferries, etc., all of which are subjects to be provided for, legislated upon and controlled by ■municipalities; some purely artificial, some appurtenant to certain natural objects, not to be found in every municipality.
Can there be any doubt of the legality of laws conferring powers upon municipalities touching wharves, landing places, ferries, etc., notwithstanding the fact that they cannot be of universal application? It is not required that the law shall have “universal application” but only “uniform operation” throughout the state.
To consider or pass upon the wisdom and appropriateness of the law, is beyond our authority or province. But it might be pointed out that there may be weighty and valid reasons for providing a different method of deciding upon and providing *704 bridges for navigable streams, from that appropriate to small streams; that the rights of navigation must be considered, a subject within the jurisdiction of the United States; that the necessity, therefore, of draws must be considered; that the effect upon wharves and upon the harbor must and should be considered, as well as the large expense involved. And therefore it may very well be deemed proper and wise to submit questions of this 'sort to the voters of a municipality like this, though the general laws in force may authorize councils to proceed without taking siich a vote.
There may be -good reasons advanced why small municipalities should not enter upon such an enterprise with authority to-make the same debt, and why there a less number of signatures should be required to a petition initiating such measures. On the other hand, reasons of an opposite character would apply to cities of a larger population.
Certain cases on this subject are relied upon 'especially by coun'sel for those who oppose an election on this question, which will be referred to briefly. In State v. Pugh, 43 Ohio St. 98, the law in question did not admit of another city of ithe same grade and class cominlg under its provisions. It applied to cities of the first grade, second class, “having trustees of the sinking fund,” and required such trustee's to “proceed within five days after the passage of this act to redistriot such cities,” etc.
The Supreme Court find that it was impossible, within the time limited by the. statute, for any other city to come into that class, even though its population entitled it to come in; and therefore the law was held to be unconstitutional.
The law under consideration in Costello v. Wyoming, 49 Ohio St. 202 was with respect to sidewalks, and it was made to apply to villages in a county having a city of the first grade of the first class “in which sidewalks have not already been constructed under the provisions of existing laws,” etc.
With respect to that kind of classification the Supreme-Court say, at page 210:
“Villages situated in counties containing large and populous-cities, and which are or may become contiguous to such cities, would naturally need legislation very different from that required by villages otherwise situated. Their particular loca *705 tion — thereby calling for the maintenance of an adequate police force, for protection against fire, for water supply, for paving, grading, curbing and lighting of streets, and for other municipal improvemenitls — would furnish reasonable grounds for placing villages so situated, in the same class, for purposes of legislation. But the case at bar presents to us a new and unique classification of villages founded on an incident or characteristic, arbitrary and restrictive, unreasonable and illusory.”
And the court thereupon proceeds to hold that such attempted classification is invalid.
Now we do not think, as do counsel presenting this case, that the facts of the case are at all like those of the case at bar, or that the reasoning there is applicable to the situation here. We think, rather, that certain of the general rules adverted to and cited in the opinion are applicable to the case at bar. This rule is cited on page 212, as laid down in Nichols v. Walter, 37 Minn. 264, 272:
“The true practical limitation of the legislative power to classify is that the classification shall be upon some apparent natural reason — some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them.”
We think that this rule would justify the classification here, if it shall be- regarded as a classification; that is, that there are such apparent natural reasons suggested by necessity for a difference based upon the navigability of streams, and the necessity of different laws with respect to the bridging of navigable streams, as would justify the placing of cities through which such streams pass in a class by themselves for the purposes of bridge legislation.
Upon the question of whether this is a classification, I remark that the law under consideration in the case at bar does not provide that in all cities of a certain grade and class having a navigable stream, all bridges may be built in a certain way; but it provides that in cities of a certain grade and class bridges over navigable rivers only may be built in a certain way. If in the Wyoming case,the law had provided that in *706 all villages of a certain claiss then or thereafter existing, unfinished sidewalks might be constructed in a certain way, we believe that it is not apparent that the law would have been obnoxious to the constitution.
Cases like State v. Anderson, 44 Ohio St. 247, and Kenton v. State, 52 Ohio St. 59, where the classification is based upon population, but the number is narrow, as in Kenton v. State, where it is based upon a difference of only ten, we regard as so unlike the case at bar as to afford no guide for its decision.
In Gaylord v. Hubbard, 56 Ohio St. 25, the law provided for the appointment of a board-of equalization and assessment in cities of ¡the second grade of the first class; and it was held that it could not be enforced; that it conferred powers that substantially differed from those conferred by the general statute upon that subject, and that the general law on the subject of taxation, and all relating thereto must govern.
The armory case, in Hubbard v. Fitzsimmons, 57 Ohio St. 436, is also a case -of a special law affecting the subject of taxation, and the law was declared void.
The law in Mott v. Hubbard, 59 Ohio St. 199, was an attempt at county classification. The case of State v. Brown, 60 Ohio St. 462, is also a county case. Hixson v. Burson, 54 Ohio St. 470, is of the same character.
The third objection is, that the law does not permit an elector to express his desire by vote, and have his vote counted in such a way that ¡this desire may be ascertained and given effect. We do not think this objection is tenable.
We see no difficulty about registering the vote of each person voting, in such a way ¡that the number voting for or against the general proposition may be ascertained and determined with certainty. And if it occurs that a number of electors vote in favor of each location, i-.t seems to us it will be a simple matter to ascertain which location has the greatest number of votes; so that full effect may be given ¡to the law.
Judge ITaynes suggests that I should go into this a little more fully, and I will do so. The so-called bridge statute provides ¡that — “* * * each registered elector of such municipality shall be entitled to vote upon the question of construction, reconstruction, enlargement or repair of bridges, *707 and to vote for only one location therefor. * * * The provisions of sections 2836, 2837 and 2837a of the Revised Statutes, except as modified herein, so far as applicable to cities of the third grade of the first class, shall apply to and govern the proceedings for the holding of elections, the issue of bonds, the payment thereof, and the construction of the work contemplated in this section. Provided, however, that the ballots for such election shall be so prepared as to read: ‘For bridge from-to-, and the issue of bonds not to exceed estimated cost, $- Yes.’ ‘For bridge from -ito -, and the issue of bonds not to exceed estimated cost, $--No.’ For each of the proposed bridge reported by said bridge commission. * * * And there shall be printed in the proper space the termini of each proposed bridge, and the estimated cost and expense thereof reported by said bridge commission. If a majority of the electors voting upon all such propositions taken together, vote in the affirmative, the common council of such city shall at once proceed to enact the proper legislation to acquire the necessary real estate and right of way for the approaches of such bridge and for the support thereof, and to cause such bridge to be constructed, reconstructed, enlarged or repaired; at the location receiving the highest affirmative vote.”
Now there are various objections suggested, some of which we do not perhaps fully comprehend, but we see no difficulty about these provisions. We say that their effect is, that each voter has an opportunity to cast one vote for or one vote against either of these propositions. He may cast a negative vote that will apply to the general proposition and ’every location, but an affirmative vote is limited to one location.
As to how his ballot shall be marked, it may be mere dicta here to say it, but we believe and hold that if a voter marks his ballot “No” as to any proposition, and does not’ mark “Yes” to any proposition, this is a negative vote as to the general proposition and as to every bridge, the same as if he marked it “No” to each and every proposition. We think that that ballot must be counted as a negative ballot. If upon that ballot with respect to any proposition or location he votes “Yes,” *708 why that is necessarily an affirmative vote as to that -particular location. It is affirmative as to the general proposition, and at the same time affirmative as to the particular location he desires.
Let us suppose there are 300 negative votes, and on all locations 400 affirmative votes. Of such affirmative votes we have 200 for the Cherry street location, 100 for the Jefferson street location, and 100 for the Grand street location. We then have 400 affirmative votes, and only 300 negative votes; so that the proposition to build a bridge is carried. Of these affirmative, votes we have 200 in favor of the Cherry street bridge, and it having the greater number of affirmative votes, under the provisions of the statute that is the location selected.
As to the ballot itself: Something was said in criticism of the provision that if it were impossible to determine the purpose of- the voter from his ballot, it should not be counted. There is nothing singular about that provision, for precisely the same provision is found in sec. 2966-35 of the general law with respect to elections. The ballots are to be separate from the general ballots for candidates for offices, as provided by sec. 2966-32. The election laws provide for keeping tally of the number of persons voting at the election, as well as a tally of the ballots for a candidate or upon' a particular proposition.
Haynes, J.:
Let me state that as I understand it. The statute here provides that every elector may vote once in the affirmative for some one bridge. The general statute provides for keeping, track of the vote, and this ballot is a separate, independent ballot. Now, upon the conclusion of the voting, the statute-provides in regard to the issuing of the certificate of the number of votes cast, etc. That should be followed in this case.. The whole number of votes cast upon the bridge question-, should be- certified. The statute also provides that a person: who votes in the affirmative may not vote but the once. Th entire statute provides that all the affirmative votes shall be-counted. If a majority- of the electors voting .upon all such propositions, taken together, vote in the affirmative, the ques *709 tion of course will be carried. You count the affirmative votes only on the question of location, no matter what the negative votes are — it is indifferent — or rather if a man votes “No” on the subject you do not count the ballot on the question of location. You take the total number of votes, and determine whether the proposition has carried or not. . That is to' say, if there are 1,000 votes cast, and 550 persons vote in the affirmative, the officers certify to that fact, and it shows that the proposition to build a bridge is carried. Afterwards, when the common council come to build a bridge they will be guided simply by the certificate as to the votes. They will adopt the location receiving the greatest number of affirmative votes. That will determine the location of the bridge. It sieems to me it is as clear as can be with regard to the vote. I do not see how there can be any question about it.
The bridge statute provides that each registered elector shall be entitled to vote, etc., and to vote' for only one location. The general election law, section 2966-32, provides that—
“Whenever the approval of a constitutional amendment or other question is to be submitted to a vote of the people, such question shall be printed on a separate ballot and deposited in a separate ballot-box to be presided over by the same judges and clerks.”
Section 2966-38 requires the number of electors voting to be stated to the public immediately after the counting of the vote. Therefore the number of ballots cast for or against bridges shall, at the close of election, be tallied and certified. The bridge law then provides that if a majority of all electors voting upon all of such propositions, taken together, vote in the affirmative, the council may proceed to the building of a bridge.
Mr. Tracy:
I would like to suggest the propriety of the court putting in the opinion what the court would consider an appropriate form of tally sheet, as it will be an efficient aid to the board of elections.
Parker, J.:
I have it here in my hand, and will give' the form to the' *710 stenographer. It is as follows:

Fx'om the number of ballots counted deduct the sum of votes-in favor of all locations. The remainder will be the number of negative votes. If this number is less than one-half of the-whole number of ballots cast, the -general proposition to build a bx-idge is carried; if more, the proposition is lost. If it carries, the location receiving the largest number of the affirmative votes is the location selected.
We.understand the petition in the injunction case was submitted here on appeal for final judgment?
Mr. Tracy:
Yes.
Parker, J.:
The rights of the different parties, then, will be saved, as-they are not here. ' '
Mr. Se-iders:
I appear here in the absence of Mr. Lewis. I would like to-ask the court this, on the question of voting: Is a negative-vote on any one of the bridges to be considered as negative-against the whole bridge-building proposition?
Parker, J.:
That is the way -w-e understand it, provided there is no affirmative vote on the ballot.
Haynes, J.:
Uj will be necessary to take the whole number of votes to* find out whether ‘the bridge proposition has been carried or not. To determine the location chosen (if a general propo— *711 sition carries), you take the affirmative votes only. Of course if a man votes twice affirmatively it i-s cast out.
In argument Mr. Lewis, stated that one standing in his situation could not express his wish, by this ballot. I understand his position to be, thathe is* opposed to thewhole schemeorplan of any bridge, and he would like to vote “No” on the general proposition; and if the vote carries in favor of building a bridge he would like to vote his choice of locations.
Now under this statute an elector is not given the right to vote against all bridges, and, at the same time, vote his choice of locations in the event that the general proposition carries. In other words, he is not entitled to say by his. vote, “I am opposed to any and all bridges being built, but if my wish to not build a bridge is defeated at the election, then I would like to have my vote counted among the affirmative votes for some particular location.” That might have been provided for by law, and this original-bill before its amend' ment contained such a provision. But 'the -legislature saw fit to amend it, leaving out that provision, and it now stands as does the law generally upon the .subect of voting for candidates for office. For instance, if there are three candidates in the field for one office, a Republican, a Prohibitionist, and a Democrat, one who votes the Prohibition ticket Votes in effect against the Republican and the Democratic candidates, and he is not permitted by his ballot to say, “I desire to have-this ballot' countéd for the Prohibition candidate, but if he is defeated, then I would like to have it counted for the Republican candidate,” or “for /the Democratic candidate.” His'right is confined to voting for one candidate. And under this bridge law, if a person-votes “No” on the general ■ proposition, that is as much as he has a right to do. He thereby says that he is not in favor of any bridge, and, therefore, not in-favor of any location. If he votes “Yes,” that he is in favor of some bridge, he may at the same time designate the location which'he favors.
To make clear what I have said as to the change in the bill: The original bill contained in lines 98, 99, 100, 101 and" part of'102, the following, which, for convenience, may be-bracketed: ...
*712 [“Provided, however, that the ballots for such election shall be so prepared as to read:
“For the construction, reconstruction, enlargement or repair of bridges, ‘Yes.’
“For the construction, reconstruction, enlargement or repair of bridges, ‘No.’ And — ”]
Then follows what now appears in the law as to the form of ballots, already quoted.
One of the amendments struck out “all in lines ioo and ioi,” and in 102 the words “No. And.” This resulted in striking out all of the above in brackets after the words “ to read.”
In the case first mentioned a peremptory writ of mandamus is awarded; in the other the petition will be dismissed.